FILED
2013 Mar-01  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES KING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:11-CV-2441-VEH** |
| | ) | |
| **PIGGLY WIGGLY ALABAMA** | ) | |
| **DISTRIBUTION COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

The court has reviewed the pending Motion for Summary Judgment (Doc. 14) (the "Motion") filed by Piggly Wiggly Alabama Distribution Company, Inc. ("PWADC") on July 18, 2012, and the parties' respective supporting and opposing materials.  (Docs. 15-19).  In his complaint, Plaintiff James King ("Mr. King") has asserted two counts:  one for race discrimination arising under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 and the second one for retaliation under Title VII and § 1981.  (Doc. 1 at 3-4).  The Motion seeks a dismissal of both counts, and for the reasons explained below, is **GRANTED IN PART** and **DENIED IN PART**.

## II.   FACTUAL BACKGROUND[1]

Mr. King, a black male, was employed by PWADC as a casual truck driver from October 20, 2008, until October 1, 2009.  AF No. 1.[2]  Pursuant to Department of Transportation regulations and company policy, PWADC's drivers are required to inspect their trailers before and after every run and to note any damage or safety issues on an inspection form.  Drivers are also required to report any accident or damage immediately.  AF No. 2.

---

[1]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[2]  The designation "AF" stands for admitted fact and indicates a fact offered by PWADC that Mr. King has admitted in his written submissions on summary judgment or by virtue of any other evidence offered in support of his case. Whenever Mr. King has adequately disputed a fact offered by PWADC, the court has accepted Mr. King's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of PWADC's Statement of Facts as set forth in Doc. 15 and responded to by Mr. King in Doc. 18.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 7.2) would indicate the second sentence of paragraph 7 of PWADC's Statement of Facts is the subject of the court's citation to the record.  Other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

On September 30, 2009, HS Trailer Repair, the company that maintains PWADC's trailers, reported significant damage to a trailer that had been parked at a PWADC warehouse door.  AF No. 4 (first).[3]  As the Damage Report provided by HS Trailer Repair indicates, because the rails on trailer number 334 were pulled in, two cross members were damaged.  (Doc. 16-1 at 6).[4]

PWADC investigated the damage and discovered that Mr. King had been the driver of the trailer in question.  AF No. 4 (second).  While Mr. King has admitted that he drove the trailer when it was loaded at Ventura Foods and also dropped it off at the yard, he maintains that someone else (*i.e.*, a hostler) moved the trailer from the yard to warehouse door number 103.  (Doc. 17 ¶ 23).

Mr. King, who never noticed any damage to the trailer, did not report any problems after conducting both his pre- and post-trip inspections.  AF No. 5; (Doc. 17 ¶¶ 20, 30).  The drivers who pulled the same trailer immediately prior to Mr. King confirmed that there had been no damage to this trailer before Mr. King drove it.  AF No. 6.

The trailer had been inspected by a supplier (Ventura Foods) at Mr. King's last

---

[3]  PWADC's brief in support of its Motion contains two paragraphs that are numbered four.  (Doc. 15 at 2).

[4]  The page reference for documents 16-1, 16-2, and 16-3 corresponds with the CM/ECF numbering system.

stop before he parked the trailer at the PWADC warehouse.  AF No. 7.1.  The report from that inspection confirmed that there was no damage to the trailer floor at that time.  AF No. 7.2.

Dale Reynolds ("Mr. Reynolds"), PWADC's Director of Operations, interviewed Mr. King about the damage to his trailer.  AF No. 8.  Mr. Reynolds reported that Mr. King initially denied that anything was wrong with the trailer, but that after "describ[ing] the damage to him, [Mr. King] then told [him] that the trailer was already damaged when he picked it up that morning."  (Doc. 16-3 at 2 ¶ 3).

The results of Mr. Reynolds's investigation are disputed by Mr. King.  While Mr. King admitted that he had some difficulty separating the tractor from the trailer, Mr. King denied that there was any damage done to the trailer because of that and denied that he ever told Mr. Reynolds that he saw damage to the trailer when he dropped it off in the yard.  (Doc. 17 ¶¶  16, 20-21); AF No. 9.  Mr. King also has sworn that Mr. Reynold told him that eight ribs on the trailer that he was driving had been repaired before.  (Doc. 17 ¶ 22).

Based on the nature of the damage and the absence of any reports of prior damage to the trailer floor, David Bullard ("Mr. Bullard"), the then-Human Resources Director, concluded that Mr. King had in fact damaged the trailer by failing to properly extend the dolly legs prior to removing his truck.  AF No. 11.

4

PWADC considers the failure to report damage to a truck or trailer a very serious offense; it considers dishonesty about the circumstances of an accident even more serious. AF No. 13. Because Mr. Bullard had determined that Mr. King damaged the trailer, that he had failed to report the damage, and that he was dishonest about the incident, Mr. Bullard decided to terminate Mr. King's employment. (Doc. 16-1 at 4 ¶ 7; *id.* at 13 (Mr. King's "EMPLOYEE'S DISCIPLINARY RECORD" dated October 1, 2009, indicating "DISHONESTY" and "FAILURE TO REPORT ACCIDENT" as "REASON FOR DISCIPLINARY ACTIONS")).

The "EMPLOYEE'S DISCIPLINARY RECORD" dated October 2, 2009, which Mr. King has acknowledged receiving, reflects "VIOLATION OF COMPANY POLICY" as the reason for his discharge. (Doc. 17 at 10). Mr. Bullard appears to have been the person who signed these similar, but yet differently dated and worded documents, and PWADC has not offered any explanation for the variances in these termination records relating to Mr. King.

In August 2009, PWADC discharged Joe Blackwell, a white driver with 20 years experience, for failing to report an accident and then being dishonest about the circumstances of the accident. AF No. 14. When discharging Mr. Blackwell, a video was presented which confirmed that Mr. Blackwell was aware of the damaged vehicle

prior to his denial.  (Doc. 17 ¶ 27).

PWADC routinely makes video recordings of all areas of the yard at all times. (Doc. 17 ¶ 26).  During his meeting with Mr. Bullard on October 1, 2009, Mr. King requested a video, but never received such a recording or "pictures of the trailer prior to the time it was moved by the hostler."  (*Id.* at ¶¶ 27, 28).

On September 4, 2009, PWADC received a report about a verbal altercation between Mr. King and a white employee of the company which maintains PWADC's truck fleet, Penske.  AF No. 15.  Mr. King provided two written statements about the incident in which he admitted that he and the Penske employee engaged in a verbal altercation and that Mr. King threatened to "stomp a mud hole in [the Penske employee's] ass."  AF No. 16.

In both statements, Mr. King provided a detailed account of the Penske employee's cursing at him, but did not claim that the Penske employee made any sort of racial statement.  AF No. 17; (*see* Doc. 16-2 at 3 ¶ 6 ("Mr. King never reported to me that the Penske employee made any type of racial statement during the altercation."); *id.* at 4 (no reporting of racial slur); *id.* at 5 (same)).

However, in his affidavit offered in opposition to the Motion, Mr. King has sworn that, during the altercation, the white Penske employee referred to him "and Brandon, two African-American males, as 'boy.'" (Doc. 17 at 2 ¶ 3).  While Mr. King

6

has indicated, in his opposition, that "he did not put the racial slur in his report of the incident, nor claimed race discrimination at that time due to fear of retaliation" (*see* Doc. 18 at 3 ¶ 4), his affidavit does not substantiate this particular statement. (Doc. 17 at 2 ¶ 5).

PWADC issued a written warning to Mr. King on September 9, 2009, about his role in the skirmish and requested that Penske similarly reprimand its employee for his involvement in the fight.  AF No. 18; (*see also* Doc. 16-1 at 17 ("EMPLOYEE'S DISCIPLINARY RECORD" reflecting a written warning for "Inappropriate verbal statements/threats towards other employees/coworkers")).

## III.   STANDARDS

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with

specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## B.  Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[5]

---

[5]  As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 782 (11th Cir. 1989) (footnote omitted).  Based upon this standard and because the only person who allegedly made an invidiously-charged utterance was not employed by Defendant and was not involved in the decision to discharge him, Mr. King's case is purely a circumstantial evidence one.  (*See* Doc. 18 at 7

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## IV.   ANALYSIS

### A.   Discriminatory Discipline on the Basis of Race

#### 1.   Written Warning for Altercation with Penske Employee

Regarding discriminatory disciplinary claims, the Eleventh Circuit has

("Plaintiff can prove a *prima facie* case of race discrimination in discipline, by using the circumstantial evidence, burden-shifting model of *McDonnell Douglas/Burdine*.")).

fashioned the following standard:[6]

> [W]e hold that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (emphasis added); *see also*

*Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980) ("With respect to

discharge for violation of work rules, the plaintiff must first demonstrate by a

preponderance of the evidence either that he did not violate the rule or that, if he did,

white employees who engaged in similar acts were not punished similarly")

(emphasis added).[7]

    Because Mr. King has admitted that he did get into an argument with the

---

[6] As neither party has drawn a distinction between Mr. King's claims asserted under Title VII versus § 1981, the court likewise evaluates Mr. King's comparable § 1981 claims under the Title VII framework. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011) ("Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework." (citing *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991)); *see also Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008) ("[T]he analysis of disparate treatment claims under [§ 1981 by and through] § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same.").

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Penske employee and because he has not pointed to any examples of drivers outside of his protected class who received more favorable treatment than he by PWADC despite such employees' becoming involved in a verbal altercation while on the job (like Mr. King did), the court finds that summary judgment in favor of PWADC is due to be entered on this particular discriminatory discipline claim for lack of *prima facie* evidence.

To the extent that Mr. King has attempted to use the Penske employee as a comparator, there is no evidence in the record that Mr. King's supervisors at PWADC had any authority to discipline a non-employee, like the Penske worker. *Cf. Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." (citing *Jones*, 874 F.2d at 1541)).

Moreover, Mr. King has not offered any other circumstantial evidence suggesting racial discrimination with respect to the decision to give him a written reprimand for the role that he played in the admitted altercation. *Cf. Burke-Fowler v. Orange County*, 447 F.3d 1319, 1325 (11th Cir. 2006) ("Because she failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination, Burke-Fowler did not establish a *prima facie* case of race discrimination." (citing *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286

(11th Cir. 2000)).

Alternatively, this discriminatory claim fails due to Mr. King's inability to demonstrate pretext. More specifically, because Mr. King lacks suitable comparator evidence and relies upon no other proof of pretext, the record lacks "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998)).

### 2.    Discriminatory Discharge

The court reaches a different conclusion about Mr. King's discriminatory discharge claim. Here, Mr. King has shown a *prima facie* case under the alternative ways identified in *Jones*. First, Mr. King has created a material factual dispute over whether he caused the damage to his trailer that resulted in his dismissal due to his purported dishonesty and failure to report an accident.

Second, Mr. King requested (but never received) a video recording of what occurred in the yard after he parked his trailer on September 30, 2009. Moreover, Mr. King has pointed out that PWADC treated Mr. Blackwell more favorably (in its decision to fire him for failing to report an accident and being dishonest about the circumstances surrounding it) because PWADC concedes that its investigation into

the incident involving Mr. Blackwell included video evidence confirming that Mr. Blackwell was aware of the damage done to his trailer.

In its reply, PWADC has not contested Mr. King's facts regarding its customary practice of videotaping the yard. (*See generally* Doc. 19 (absence of any factual reply)). PWADC also has not disputed that a holster is usually the person responsible for moving the trailer from the yard and dropping it off at the warehouse door. *Id.* PWADC also has not provided any explanation why it did not produce and review any videotapes (or pictures) of Mr. King's trailer like it did with respect to the incident involving Mr. Blackwell. *Id.*; *cf. Morrison v. Booth*, 763 F.2d 1366, 1374 11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination." (citing *Jean v. Nelson*, 711 F.2d 1455, 1492 (11th Cir. 1983)).

Additionally, Mr. King has adduced unchallenged evidence of two white drivers who admitted to Mr. King that they caused an accident when they were racing and collided with each other after one of the drivers stopped for a red light and the other did not. (Doc. 17 ¶ 35). While the white drivers acknowledged that they had been in an accident that resulted in damage, they dishonestly reported that it had occurred because of a third vehicle's pulling out in front of them. (*Id.*). Mr. King subsequently notified PWADC management about what he had learned from the white drivers, and PWADC did not fire either one of them. (*Id.* ¶¶ 35-36).

In its reply, PWADC does not dispute any of these facts presented by Mr. King regarding the white drivers who it retained despite their dishonest actions.  Instead, PWADC contends that because they reported the accident (unlike Mr. King), the white drivers are not similarly situated to Mr. King, who was fired not only for being dishonest, but also for failing to report his damage.  (Doc. 19 at 6).

"In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same <u>or similar conduct</u> and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis added).

As the Eleventh Circuit aptly explained in *Anderson v. WBMG-42*, 253 F.3d 561 (11th Cir. 2001):

> In arguing that the conduct of comparator employees must be the same or nearly identical, WBMG takes the same position rejected by this Court in *Alexander v. Fulton County*, 207 F.3d 1303, 1334 (11th Cir. 2000).[8]  In that case, the employer defendant contended that the trial court had mischaracterized the law by charging the jury that it could find discrimination where "another similarly situated employee" was not treated in a "similar manner":
>
> > Defendants claim that the term "similarly situated" is ambiguous, and that this [jury] charge miscasts the governing law of this circuit, which they claim requires the "same or nearly identical conduct." Again, we disagree.

---

[8]  *Alexander v. Fulton County*, was overruled on other grounds by *Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003).

Although susceptible to manipulation, the phrase "similarly situated" is the correct term of art in employment discrimination law. <u>Moreover, the law does not require that a "similarly situated" individual be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff. Instead, the law only requires "similar" misconduct from the similarly situated comparator</u>. *Olmstead v. L.C. by Zirming*, 527 U.S. 581, 119 S. Ct. 2176, 2193, 144 L. Ed. 2d 540 (1999) (Kennedy, J., concurring in the judgment) (characterizing the "normal definition of discrimination" as "differential treatment of *similarly situated* groups" (emphasis added)); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." (emphasis added)); *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when *similarly* situated workers are treated differently even though they have committed similar acts." (emphasis added)); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (holding that in order to show discriminatory discipline, plaintiff must show either that he did not violate the work rule or "that he engaged in misconduct *similar* to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against other persons who engaged in *similar* misconduct" (emphasis added)).

*Alexander*, 207 F.3d at 1334-35.  To the extent that "unprofessional behavior" can be understood by the ordinary use of that term, <u>we reject WBMG's position that the proffered evidence in this case was not relevant as comparator evidence because the conduct of Lockridge and Allen was not identical</u>.  *See id.*

*Anderson*, 253 F.3d at 565 (emphasis by underlining added).

15

Thus, within the Eleventh Circuit (and if and until the Supreme Court or the Eleventh Circuit en banc holds otherwise),[9] the misconduct engaged in does not have to be identical or even nearly identical in order for another employee to be a valid comparator.   Moreover, in this situation, an argument can be made that the admitted misconduct of the white drivers (*i.e.*, recklessly racing each other, causing an accident, damaging two vehicles, and lying about the circumstances of the wreck) is not only similar in nature, but actually more serious than what Mr. King was found to have done.[10]   *Cf.  McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 2580 n.11, 49 L. Ed. 2d 493 (1976) ("Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other 'employees involved in acts

---

[9] *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court."). PWADC relies upon *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), for the proposition that the comparator's conduct must be "nearly identical" before a court can properly consider such evidence in opposition to summary judgment.  (Doc. 19 at 5). However as *Anderson* illustrates, *Maniccia* is preceded by several other Eleventh Circuit decisions that do not impose such an exacting similarly situated standard on a plaintiff, who is asserting disparate treatment in the workplace.

[10] In its own statement of facts, PWADC has indicated that it considers being dishonest about the circumstances of an accident (which the white comparators were) to be even more serious than failing to report damage.

against (the employer) of [c]omparable seriousness . . . were nevertheless retained . . .' is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.").

Additionally, while PWADC insists that Mr. King has offered inadequate comparators, as the Eleventh Circuit has clarified, the absence of acceptable comparator evidence will not always dispose of a discrimination claim:

> The district court, in dismissing Mitten's claim of race discrimination, did as federal courts routinely do in disposing of cases, like this, in which the plaintiff claims that his employer applied a workplace-conduct rule in violation of Title VII: the court used *McDonnell Douglas*'s burden-shifting framework. In so doing, the district court focused on whether Mitten's termination for his violation of the zero tolerance policy was more severe than the discipline Lockheed imposed on similarly situated black comparators. Mitten's comparators were deemed not "similarly situated," so the court found no tenable claims of race discrimination. If the record contained no circumstantial evidence from which a jury could otherwise infer that Mitten was fired because of his race, our discussion would end here, and we would affirm the district court's judgment.

> However, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.

> Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *See Holifield v. Reno*, 115 F.3d

17

1555, 1562 (11th Cir. 1997) (declaring that, in cases where a plaintiff cannot establish a *prima facie* case, summary judgment only will be "appropriate where no other evidence of discrimination is present." (citations omitted)); *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011) ("To avoid summary judgment . . . the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman*, 637 F.3d at 734 (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.").

      A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that the plaintiff established a *prima facie* case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under *McDonnell Douglas* is "flexible and depend[s] on the particular situation" (citations omitted)); *cf. Burke–Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming the district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented *no other circumstantial evidence suggesting racial discrimination*" (emphasis added)). Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

*Smith*, 644 F.3d at 1327-28 (footnotes omitted) (emphasis added).

Therefore, even if the employees relied upon by Mr. King do not fully constitute valid comparators, there is still other circumstantial evidence suggesting racial discrimination in the decision to discharge him. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997) ("The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" (quoting *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)). Such proof includes PWADC's apparent refusal to produce (or review) the video recordings of the yard (which the company regularly makes) to verify whether a hostler caused the damage to the trailer as well as the unexplained deviations in PWADC's records relating to the documentation of Mr. King's discharge. (*Compare* Doc. 16-1 at 13 (Mr. King's "EMPLOYEE'S DISCIPLINARY RECORD" dated October 1, 2009, indicating "DISHONESTY" and "FAILURE TO REPORT ACCIDENT" as "REASON FOR DISCIPLINARY ACTIONS"), *with* Doc. 17 at 10 (Mr. King's "EMPLOYEE'S DISCIPLINARY RECORD" dated October 2, 2009, indicating "VIOLATION OF COMPANY POLICY" as "REASON FOR DISCIPLINARY ACTIONS")); *cf. Bechtel Const. Co. v. Secretary of Labor*, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of Bechtel's terminating Nichols

is further demonstrated by Bechtel's shifting explanations for its actions."). Accordingly, because a reasonable jury could return a verdict for Mr. King, the Motion is **DENIED** with respect to his discriminatory discharge claim.

## B.    Retaliation

Mr. King premises his retaliation claim upon the internal complaint that he made to his supervisor, Shane,[11] about a white employee from another company (*i.e.*, Penske) calling him and one other African-American co-employee "boy" after Mr. King and the Penske employee had gotten into an argument.  Mr. King also reported this same incident to Mr. Bullard, PWADC's Director of Human Resources, during a meeting that they had on October 1, 2009.  Thus, Mr. King's Title VII retaliation claim is an opposition-based one.

Under binding Eleventh Circuit precedent:

[A] plaintiff can establish a *prima facie* case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. <u>A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It</u>

---

[11]   The court was unable to locate the full name of this particular PWADC supervisor in the record.

thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a *prima facie* case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis added).

PWADC contends that Mr. King cannot prevail on his retaliation claim because he is unable to show that he engaged in statutorily protected conduct.  (Doc. 19 at 1-2).  More specifically, PWADC maintains that despite Mr. King's being subjectively offended by the use of "boy" in direct reference to him and another black employee and swiftly reporting such incident to his supervisor and subsequently to PWADC's Director of Human Resources, he cannot show objective reasonableness.

In making this argument, PWADC relies upon *Little*, *Butler v. Alabama Dept.*

21

*of Transp.*, 536 F.3d 1209 (11th Cir. 2008), and *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001).  Therefore, the court closely examines these decisions.

In *Little*, the court determined that the white plaintiff failed to satisfy the objectively reasonable prong in asserting retaliation relating to the alleged harassment that he endured after his reporting of a racially derogatory comment made by another white employee about some of their black co-workers:  "Nobody runs this team but a bunch of niggers and I'm going to get rid of them."  *Little*, 103 F.3d at 958 (internal quotation marks omitted).  As the court reasoned in rejecting the plaintiff's Title VII retaliation claim:

> In light of the facts of this case, however, we find Little's assertion that he reasonably believed Wilmot's comment to be a violation of Title VII by Carrier to be implausible at best. <u>As noted above, Little never voiced his concern over Wilmot to a supervisor or management-level employee at Carrier and reported the comment for the first time in a team meeting held approximately eight months after the remark was made.</u>  <u>The record indicates that no rational jury could find Little's belief that his opposition to Wilmot's racist remark constituted opposition to an unlawful employment practice to be objectively reasonable.</u>  As a result, although we acknowledge that a plaintiff conceivably could prevail on his retaliation claim notwithstanding the fact that the practice he opposed was not unlawful under Title VII, such a circumstance is not presented in this case. We conclude not only that Little's opposition to Wilmot's racially derogatory comment did not constitute opposition to an unlawful employment practice as a matter of law, but also that, based on the particularized facts of this case, Little did not have an objectively reasonable belief that he was opposing an unlawful employment practice.

*Little*, 103 F.3d at 960 (emphasis added).

Mr. King's retaliation claim differs from *Little* in at least two critical ways: one, the racial slur that he heard was directed at him, and, two, he immediately reported the incident to his supervisor and later to PWADC's Director of Human Resources. Therefore, *Little* does not clearly establish that no reasonable jury could conclude that Mr. King's "did not have an objectively reasonable belief that he was opposing an unlawful employment practice." *Id.*

In *Butler*, the black plaintiff maintained that she was retaliated against for reporting, to her immediate supervisor, a white co-employee's use of "racial epithets in her presence . . . [during] a lunch break." *Butler*, 536 F.3d at 1213. More specifically, the white co-employee asked the plaintiff after the truck he was driving collided with another vehicle while he and the plaintiff were on their way to lunch: "Did you see that? Did you see that stupid mother fucking nigger hit me?" *Id.* at 1210 (internal quotation marks omitted). The white co-employee later stated to the plaintiff: "Look at him now. Now that stupid ass nigger down there is trying to direct traffic. I hope something come [sic] over that hill and run over his ass and kill him." *Id.* (internal quotation marks omitted).

The Eleventh Circuit relied upon *Little* in deciding *Butler* and explained:

> Assuming that Butler did believe that Stacey's words immediately

23

after the wreck amounted to an unlawful employment practice by ALDOT, her belief is not objectively reasonable. It is not even close. The incident consisted of Stacey's use of a racial epithet twice a few minutes apart. What Stacey said was, as Butler testified, "uncalled for" and "ugly." But not every uncalled for, ugly, racist statement by a co-worker is an unlawful employment practice.  This incident occurred away from work. It did not happen within the hearing of any supervisors.   Butler admits that she never thought the epithets, deplorable as they are, were aimed at her.  She has never even suggested that this one-time use of vile language away from work created a hostile work environment.  She also conceded during cross-examination that the incident did not affect her ability to do her job.

The incident that gave rise to this case is nowhere near enough to create a racially hostile environment.  We held in *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002), that in order "[t]o establish that a workplace constitutes a hostile work environment, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 1344 (internal quotation marks and citation omitted). It is objectively unreasonable to believe that the use of racially discriminatory language on one occasion by one co-worker away from the workplace is enough to permeate the workplace with "discriminatory intimidation, ridicule, and insult" and to "alter the conditions of the victim's employment and create an abusive working environment." *See id.*  This is what we said about that in the *Little* case:

> [A] racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under the opposition clause of Title VII, 42 U.S.C. § 2000e-3(a), and opposition to such a remark, consequently, is not statutorily protected conduct.

*Little*, 103 F.3d at 961.  And, as we also explained in *Little*, "not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of

an employer, not an act of discrimination by a private individual." *Id.* at 959 (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)).

> While a plaintiff can prevail on a retaliation claim based on opposition to an employment practice that is not actually unlawful, we have to consider the controlling substantive law in this circuit when we assess whether a plaintiff's mistaken belief is objectively reasonable. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 & n.2 (11th Cir. 1998) (examining the objective reasonableness of an employee's belief that an employment practice is unlawful in light of existing substantive law). <u>Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable.</u> *See id.* at 1388-89; *see also Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002) ("Finally, the plaintiffs may not stand on their ignorance of the substantive law to argue that their belief was reasonable. As we have stated previously, if the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge." (internal citations, brackets, and quotation marks omitted)).

*Butler*, 536 F.3d at 1213-14 (emphasis added).

The plaintiff in *Butler* is dissimilar to Mr. King in at least two significant ways. First (and like the plaintiff in *Little*), the epithets uttered were not directed at the plaintiff. Instead, the racial remarks were made about a stranger. Second, the incident occurred away from the workplace. Therefore, *Butler*'s holding does not necessarily dictate that Mr. King is unable to satisfy the objectively reasonable retaliation standard.

25

However, *Butler* does provide a useful framework under which a court may evaluate objective reasonableness for the purposes of an opposition-based retaliation claim: "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler*, 536 F.3d at 1214.

*Breeden* involved an opposition retaliation claim premised upon the following facts:

> On October 21, 1994, respondent's male supervisor met with respondent and another male employee to review the psychological evaluation reports of four job applicants. The report for one of the applicants disclosed that the applicant had once commented to a co-worker, "I hear making love to you is like making love to the Grand Canyon." Brief in Opposition 3. At the meeting respondent's supervisor read the comment aloud, looked at respondent and stated, "I don't know what that means." *Ibid.* The other employee then said, "Well, I'll tell you later," and both men chuckled. *Ibid.* Respondent later complained about the comment to the offending employee, to Assistant Superintendent George Ann Rice, the employee's supervisor, and to another assistant superintendent of petitioner. Her first claim of retaliation asserts that she was punished for these complaints.

*Breeden*, 532 U.S. at 269-70.

In reversing the Ninth Circuit which had ruled in the plaintiff's favor on summary judgment, the Court explained:

No reasonable person could have believed that the single incident recounted above violated Title VII's standard. The ordinary terms and conditions of respondent's job required her to review the sexually explicit statement in the course of screening job applicants. Her co-workers who participated in the hiring process were subject to the same requirement, and indeed, in the District Court respondent "conceded that it did not bother or upset her" to read the statement in the file. App. to Pet. for Cert. 15 (District Court opinion). Her supervisor's comment, made at a meeting to review the application, that he did not know what the statement meant; her co-worker's responding comment; and the chuckling of both are at worst an "isolated inciden[t]" that cannot remotely be considered "extremely serious," as our cases require, *Faragher v. Boca Raton*, *supra*, at 788, 118 S. Ct. 2275. The holding of the Court of Appeals to the contrary must be reversed.

*Breeden*, 532 U.S. at 271 (emphasis added).

Therefore, *Breeden* dealt with a female plaintiff who complained about the joking behavior of her male supervisor and male co-worker while all three employees were reviewing job applications. Although the sexually-charged joking involved the plaintiff's supervisor, the Court nevertheless determined that the situation objectively lacked the level of severity necessary to meet Title VII's harassment standard. In contrast, Mr. King's complaint involves the use of a racial slur against him and another black co-employee in a non-joking manner in the workplace.

Against this backdrop, the court finds that while *Little*, *Butler*, and *Breeden* all strongly suggest that another company's white worker's calling Mr. King and another black worker "boy" on one occasion would not state a claim for actionable racial

harassment, none of these decisions "squarely holds" that the particular conduct at issue is not an unlawful employment practice. Moreover, PWADC has not cited to any other controlling authority which "squarely" establishes such a legal precedent.

However, in *McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008), the Eleventh Circuit did squarely hold that the sporadic use of racially insensitive terms such as "girl" and "boy" by a white supervisor in the workplace when addressing subordinate black employees, including the plaintiff, without more, does not constitute actionable racial harassment. As the *McCann* court addressed the merits of the plaintiff's claim:

> To establish a hostile work environment claim, McCann must show: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Determining whether the harassment was sufficiently severe or pervasive involves "both an objective and subjective component." *Id.* at 1276. In determining the objective element, a court looks to " 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Morgan*, 536 U.S. at 116, 122 S. Ct. 2061 (quoting *Harris*, 510 U.S. at 23, 114 S. Ct. 367); *see also Miller*, 277 F.3d at 1275.
>
> McCann alleges she was subject to a hostile work environment where white employees made derogatory racial comments about blacks,

harsher discipline was received by black employees, and complaints of discrimination were subject to retaliation and not investigated. According to McCann, however, the only racially insensitive comments she heard between 2003 and 2005 were when Bounds [*i.e.*, McCann's immediate supervisor] called her "girl" and called two male black employees "boys." McCann also alleges that, at some time prior to 2003, out of McCann's hearing, Tillman [*i.e.*, the Sheriff of Mobile County] referred to a former black employee as a "nigger bitch" and declared that "he had never received the 'nigger vote' and that he didn't want it. . . ."

Although offensive, such instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment. As the district court properly found, the only term ever directed at McCann was "girl" and the term "boy" was used only once in front of her. *McCann*, 2006 WL 1867486, at *20. McCann does not allege that anyone else ever used racially derogatory speech towards her. Although McCann heard of racial epithets being spoken twice by Sheriff Tillman, these were never directed at *McCann*, nor spoken in her presence. *Id.*; *see also Harris*, 510 U.S. at 21, 114 S. Ct. 367 (finding that the "'mere utterance of an ... epithet which engenders offensive feelings in a employee,' ... does not sufficiently affect the conditions of employment to implicate Title VII") (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)). Moreover, although McCann alleges that she was upset by this language, she has not demonstrated that the alleged environment interfered with her job performance. In fact, McCann actually testified that it did not affect her work.

Consequently, the evidence presented by McCann was insufficient to support a claim of hostile work environment, and the district court properly granted summary judgment with respect to this claim.

*McCann*, 526 F.3d at 1378-79 (footnote and citations omitted) (emphasis added).

29

Thus, the *McCann* decision squarely holds that a <u>supervisor's</u> sporadic use of racially insensitive terms directed at the plaintiff and her co-workers (in conjunction with other pieces of racially derogatory evidence that were not directed toward or heard directly by the plaintiff) is insufficient to support a claim of racial harassment. Moreover, the holding in *McCann* "squarely" confirms that Mr. King's complaint about an isolated racial utterance directed at him and one other black employee by a <u>non-co-worker</u> is, *a fortiori*, inactionable under Title VII. Furthermore, the court is unaware of any binding precedent which undermines the analysis utilized in *McCann*.

Finally, reading *McCann* and *Butler* together, because *McCann* "squarely holds that particular conduct [in form of the sporadically using racially insensitive terms such as "girl" and "boy" when addressing black employees] is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, the plaintiff's contrary belief that the practice is unlawful [for the purpose of asserting an opposition-based retaliation claim] is unreasonable." *Butler*, 536 F.3d at 1214. As a result, Mr. King's retaliation claim fails because to the extent that the complaint that he made about racial harassment satisfies the subjective retaliation standard, his belief regarding Title VII unlawfulness about the isolated racially insensitive conduct, consistent with *McCann* and *Butler*, lacks objective reasonableness. Accordingly, the

Motion is **GRANTED** with respect to count two of Mr. King's complaint.

## V.   CONCLUSION

In accordance with the above analysis, the Motion is **GRANTED** in connection with Mr. King's claims for discriminatory written warning discipline and retaliation. Accordingly, those claims are both **HEREBY DISMISSED WITH PREJUDICE**.

However, the Motion is **DENIED** as to Mr. King's discriminatory discharge claim.  By separate order, the court will set this case for a final pretrial conference.

**DONE** and **ORDERED** this the 1st day of March, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

31